We have one case to submit under the briefs, to be submitted as noted in the calendar. The first case to be argued is Metro Golden Bay Studios v. Midway Games. May I please the court, counsel? My name is Hugh Balsam, counsel for Midway Games, and I'd like to reserve five minutes for rebuttal, please. Thank you. Your Honor, the very most that MGM has established in this case is that a few aspects of the appearance or backstory of, depending on the platform, one or two of the 17 fanciful boxers in Midway's ready to rumble game call to mind or are vaguely similar to characteristics in the Rocky movies. And if that's how you establish in a copyright case, you're supposed to have somebody's judgment entered against you and not for you. I'd like to start today with the elements that we believe are not protected or not protectable by the copyright law. First, we have the Ivan Drago character. Ivan Drago is not the story being told in Rocky IV. He only appears in Rocky IV. He's not the story being told there. The story being told there is Rocky's story, hence the name of the movie, Rocky IV. Drago appears in 15 to 20 percent of the movie. He's got 10 speaking lines. At best, he's a chessman. We learn nothing about his family background, his interests, his loves, his likes. At best, he's a chessman in a larger story of the East-West showdown. Nor is he especially distinctive. He's, at best, a stereotypical Soviet athlete, highly trained in automaton, basically a symbolic metaphor for the East in the old Cold War East-West struggles. So, arguing that Drago is not protectable? That's right. They could have had a character that was called Ivan Drago, or you guys could have had a character called Ivan Drago, the spitting image of Dolph Lundgren, and said things like, use every line that Drago, you know, there were only 10 lines, but he used every single one of those lines in the video game. It's not protectable. Well, the character itself is still, I mean, we would... That's your question. Yeah. You know, you could say yes or no. They copied it. They got the cartoonists to make somebody that looks just like Dolph Lundgren and says only the things that Dolph Lundgren says in the movie. And they call him Ivan Drago and his pants or whatever, his box of shorts, whatever they wear, look exactly like whatever they are. The color of the gloves are the same. Well, even if... I might say that's still not protectable, but we would still be liable because then there's a virtual identity standard that would apply when all the elements that... If it's not protectable, you can copy it. You can just lift it bodily into your work and say, thank you very much. And then you'd be liable under the virtual identity requirement. You can string together a bunch of non-protectable elements in such a way that if you strung them together in a way that's virtually identical and it's a significant way, then you could be... Because this is something you haven't put in the briefs. But for purposes of your analysis here, it would not be protectable. They could do that because what you're saying is the character is not sufficiently protectable, not sufficiently distinctive. I would say he's not sufficiently distinctive and still not protectable because under this court's story being told test, he does not satisfy the story being told, nor is he particularly distinctive. Those are the two elements that have been floating around in the case law, and that's what I have to work with. And so I would say then he is not protectable, although if somebody lifted his image verbatim with all those 10 lines, that lifter could still be liable. Pardon me? How about Spock? Spock? To the extent that he's a character divorced from the physical characteristics of Leonard Nimoy, Spock would probably qualify for a protectable character. Well, it's not about him. It's a story about the captain and the surprise. I haven't watched Star Trek, so to know who the story is about, I'm sorry. But I would say that he would fall more in the lines with a Godzilla or somebody that's been somewhat of an icon of American culture, which is typically the types of characters that get copyright protection. They name the movie after, so you don't have to worry too much about whether that was protectable. Right. And unfortunately, I don't have to worry about that in this case. I've always wondered why counsel always start with the weakest argument. Is it you really want to be spending the first five minutes? I think I'm going to move on. Are you really arguing that this is not protectable even if Barlow lifts it out? Well, it's one of our, we have certain elements that are not protectable, and I think they logically fall. 20 minutes. I'm moving on, Your Honor. Okay. We've also got the... The six of them already on your weakest argument? We've also got the physical appearances of these various actors, and as we've argued in our brief, these physical appearances are also not protectable. They're not original works of expression under the Copyright Act. And as far as I can tell, no case of this court has given copyright protection to a character that's embodied in the physical characteristics of a particular live actor. Even the district court cases that gave the Rocky character copyright protection, that was the accused work there was a screenplay. No one's ever... Character looks, just happens to look just like the person. Well, I suppose if they doll him up and put pointed ears or give him some special characteristics, that might be different. Well, that would be different because I think then the actor, that's not... The actor then would have a cause of action for a right of publicity or a misappropriation claim. That would not be what MGM would really not be able to assert, you know, assert appropriation of the image. And I think that would be a closer cause of action than a copyright in the physical manifestation of the actor. The actor is not, you know, he's not a work, he's not an original work of expression. He's not a... That's a very superficial for you because actors only look in movies the way the movie maker makes them look or lets them look. You see an actor walking down the street, they don't look anything like that. The hair, the way the skin looks, the way the camera angles can make a tall actor short and a short actor tall. You know, the idea that somehow what you see in the movies is the actor, I mean, it's a fiction, it's not reality. Well, it is the actor. In this case, they're talking about the droopy eyes and the look of Stallone and the size of his arms. I mean, they're talking about the look of... Oh, but that was wax, you know. Pardon me? Wax is a wonderful thing. You can get droopy eyes and... Well... I mean, you know, I don't know how much of those muscles that you see in Rocky are really Stallone's. Maybe they are, I have no idea, but I know they could make me look like that without difficulty. We don't have any other evidence in this case. To the extent that they are Stallone's, they're not copyrightable because they're not a work of expression, they're a creation of his parents. Maybe a work of expression of something else, but not as contemplated by the Copyright Act. There's other elements that they're asserting, and all of these different plot elements are basic incidents, as we've argued in our brief, too general or abstract to deserve protection. A boxer training, winning, losing, taunting, the East vs. West story, basically the entire symbolism of the entire... All of these various plot elements are just... They're too general, they're too abstract, they're too incidental to a standard characterization of a boxing story to deserve protection. But you remember what was said in Metcalf? Yes. You can take a lot of things that are individually unprotectable, and if you put them together in a high combination, they become protectable. It's the magic of the camera. There's nothing new, really, under the sun at all, right? Right. It all goes back to Aeschylus, right? Right. Those guys. Right. And we're just sort of telling the same stories in a slightly different way. Right. You could be liable for the way you string a bunch of unprotectable elements together, as in the Metcalf case. But, again, if you have certain elements that are substantially similar, then this court has said that you look to see... If there's a few elements that are strung together similarly in a larger work, you look to see whether that's qualitatively important. And I think you've got to look at the context here. It's key. Because this Geno character is one character... First of all, he appears in only one of the four platforms. He's one boxer out of the 17. He's a fanciful characterization. His image and presence is not used to sell the game. It's... It was ready to rumble, the original one, yes? Yes, the original one. Original game. That's correct, Your Honor. And so PlayStation probably had more games than the others combined, didn't it? I'm not aware. Of this particular game. Right. I'm not aware. Was there something in the record that said that I think a third or less than a third of the units sold of this game were PlayStation units? I thought I saw that someplace. That could well be. I might have forgotten it. I'm sorry. But in any event, when you're dealing with all these unprotectable elements, you could still be liable if there is virtual identity. That's the idea of the merger between the idea and the expression, as this court has held. But our position is that MGM cannot even establish substantial similarity. All of the similarities that they're relying on either don't exist or they've been overstated or too general or tenuous. If you take a look at the stiletto character for... Virtual identity. You can... Even though something is unprotectable, if you have virtual identity, it's unprotected? Right. I would say that that that Bosco case is a good example of that. But because of the way the different elements were strung together. But here you don't even have substantial similarity. If you look at the looks, you can judge for yourself. We we have the photograph of the employee. But in Bosco you have a... Something was clearly protectable to begin with. It was a screenplay. Right. You don't... You can't use the standard of virtual identity to say, you know, there's something unprotectable here. OK, so we have a... MGM's case is worse. Virtual identity to Shylock. It still doesn't become protectable. Shylock is a character in the public domain. Remember Shylock? Yeah. Shakespeare. Right. I'm moving around here. I know you are. I could tell. OK. If you look at the stiletto character, for instance, take a look. We don't think that the looks are similar. There's no personality in this Geno stiletto character. And even the backstory that they rely on is... Unlike the movie? Pardon me? Unlike the movie. What is? I'm sorry? No personality. No personality. Unlike the movie. The game character has no personality. And if you look at the backstory, you know, there's a couple of different elements to it. He's a proven warrior. Well, first of all, the backstory doesn't even appear in the game. But to say he's a proven warrior, well, that's... That prevented from being infringement. And it sounds like the focus may be on the few pages in the instruction booklet, but that instruction booklet is distributed together with the game. It is distributed with the game, Your Honor. But I think most people that would play the game don't, you know, might not encounter the instruction manual. But it is in the instruction manual. But in any event, the story itself... Who have you been talking to? Some players. Not all of them. Yeah. Just turning to a couple of the different elements of the story. A proven warrior. Well, anyone could be a proven warrior. Won and lost the championship many times, coming out of retirement. George Foreman, Muhammad Ali, Sugar Ray Leonard. Now a respected trainer, donning his stars and striped trunks, entering the pugilist world for the last time, doesn't even appear in Rocky IV or Rocky V. He's got one protege. He doesn't reenter the pugilist world. He engages in a street fight, and he doesn't wear stars and striped trunks. He wears street clothes in Rocky V. The same with Boris Nakamov. Most of the storyline is just wrong. Boris is from Croatia. Ivan Drago is from the USSR, from the Soviet Union. Folk hero in his country. Lech Walesa is a folk hero in his country. One of the most complete fighters in the circuit. We submit that that's, again, a non-protectable element. And then, with support of the best Olympic coaches and gyms in Croatia, he trains intensely for every fight. Well, Drago does not have Olympic coaches. He doesn't train in Croatia. And training intensely for every fight to not let his country down. It's just, that can be any actor or any character, any boxing story. Also, turning to a comparison of the game and the movies, the game obviously has no plot, no theme, no sequence. It's totally driven by the players. No dialogue. Just a couple of different stock taunt phrases. The setting is a boxing ring. If you watch the movie and you look at the videotape of the game or play the game, you just can't... They're not even remotely similar, let alone substantially similar. And yet, some people have seen... We know this because in the records, reviewers have said, Oh, you know, there's this guy that looks just like Ivan Drago. I mean, obviously, some people see Ivan Drago. Right. Right, well, that's... What do you make of that? I would say that our characters can be reminiscent or call to mind. And call to mind is... That might get you a liability on misappropriation. But that's not... Calling to mind is not substantial similarity. A lot is required for substantial similarity, and calling to mind is not it. You know, everyone... Every story can call to mind the Romeo and Juliet story or any other story that's copyright. The Coens and the Kellys from the Nichols case. Calling to mind just doesn't establish liability. I see I have only four minutes left, so I'm going to sit down now. It's going to be hard for you to say five. Pardon me? It's going to be hard for you to say five. Right. Every one of the... Thank you, Your Honor. You're from the other side. Thank you. Good morning. May it please the court, counsel, Daniel Schechter of Latham & Watkins on behalf of the appellee, Metropolitan Mayor. Your Honor, I'm going straight to the issue of substantial similarity. The key issue and the key way to view the case is that, number one, this is artistic work. It is not a fact compilation entitled to thin contract protection. It is an artistic work entitled to the broadest protection. That alone substantially guides the analysis, but another critical factor, and one that's largely overlooked by Midway, is the fact that you had not only virtually undisputed access, but truly this case presents itself much in the way a parody case presents itself. At the end of the day, stripped away from Midway's arguments is the fact that they started these characters in the game and ended these characters with the Rocky and the Drago character. Now, there was some movement around and below, but ultimately, before this court, it's undisputed. But they're entitled to come close. But absolutely, they're entitled to start with what they want. As a parodist, it's entitled... They're entitled to come close so long as they don't step over the line. Exactly, Your Honor. Where they started from doesn't matter. Well, Your Honor, it actually does matter because... Let me tell you what your problem is. If I look at these two scenes, they don't look anything alike to me. You know, if I... So, if you took away Geno Stilettos, you know, and just showed me this picture, and said, who does this look like? I would have said no one. And I've seen the Rocky. I've seen the Rocky. I look at this picture on page 13. It's nothing like this guy, Dolph Lundgren. I certainly would not have guessed, looking at this guy, that this is Dolph Lundgren from Rocky IV. And seeing them side by side, they look totally different. This one guy has a long face. And the only thing they've got in common is a flat top, a blonde flat top. But, Your Honor... So, what have you got? I mean, when all is said and done, you've got something that sort of reminds people. Your Honor, we don't just have the visual characteristics of these two boxers as presented in the films. Midway wanted to view these characters with far more than just a visual appearance. And if it was just the visual appearance that was at issue, it might be a very different case. But they took, they appropriated all the key plot elements that related to these characters, for Drago, for Rocky IV, that relate to the characters. I'm not saying they took the entire movie. It's his love interest. I mean, that's a big part of the... You know, she's there for him. She supports him when he's down. She bucks him up. You know, it's a big part of Rocky. It's Talia Shire. Sure. You know, that's not there. I didn't see Virgis... What's his name? Meredith. Mickey. Mickey, thank you. I didn't see Mickey in there. I didn't see him doing any... I didn't see him going up the steps. I mean, you could have a video game that went through the Rocky sequence, okay, where he fights Apollo Kreeg, and then when he makes his way past Apollo Kreeg, he marries, you know, he gets a girl, whether it's Talia Shire or somebody else, and then, you know, he goes and... I forget what the sequence is exactly. You could have a video game like that that follows a plot. There's none of that here. Well... There's nothing like it. All you've got is a face and a body that don't particularly track. It's something that reminisces people, attempts to get people to sort of maybe... If you happen to remember who Ivan Drago is... Well, and the Consumer Survey... I'm not sure people who play this game today have any clue at all. Well, the Consumer Survey, which is undisputed in the record, tells us that there is that recognition. The Consumer Survey at my house said, who's Ivan Drago? Fortunately, that's not in the record, Your Honor. Now, what was the percentage for Drago? That's not relevant. Understood. It was like 22%? And the percentage for Rocky was 31%. Frankly, I was shocked that it was as low as that. I'll give you Philadelphia. But other than Philadelphia, what is there in the character that isn't a classic stereotype that exists in every boxing movie over the past 50 years? Your Honor, and this is interesting, in reading the briefs, both before this court and below, when you have a scenes-off-air case, you have a case involving an allegation of stock characters, the defendant's first response is, well, here's the 16 other movies, TV shows, books with these standard tropes. How many other Eastern European boxers have they identified from movies? Well, the world champion right now, for one. Unidentified from film or fiction? Zero. Not a single one presented by Midway. And these collection of characteristics of the boxer... It's interesting to me the East versus West plot of Rocky IV was unique because it came up with, lo and behold, a Soviet Eastern block boxer. I mean, every Olympics for the past 50 years where boxing was featured, you had East versus West, you had Soviet athletes characterized as products of the scientific machine forever. The idea of an Eastern block boxer doesn't strike me as being particularly unique. Yes, Your Honor. However, to marry that with the existing Rocky plot, character and development that had been presented over three movies, with the boxing metaphors, there's no question, let's be clear. If we're here today because there's an Italian boxer and he has a climactic fight, that's scenes up there. That's stock scenes. But when you marry together all the elements that they took from Rocky, and ultimately when you look at Gino Andrago, everything that they are comes from the movies. And they are more than that. I think even Salone would probably be insulted to be said he looks like. What a... How much money was this thing? I take away some... This is not my vision of Salone. Well, and again, it's not just about the visual appearances. It's almost... For one thing, I'm no expert on Rocky movies like I know some of you are, but it seems to me the thrust of those things is developing a human being. It's not what goes on just in a boxing ring. Well... Psychological kind of thing. And this is just characters in a boxing ring. If you're just going by that little bio, that hardly gets one very far. Well, in terms of copyright infringement, this is going to result in a permanent injunction on summary judgment, particularly. One would think. Understood, Your Honor. And again, if we were merely here because they took two boxers, one-dimensional video game representation, tried to view them with no characteristics, one has to ask, why is there an instruction booklet that gives a backstory? Why are they creating this backstory? And again, let's go back to where we were at the starting point, which is they started with Rocky and Drago. And that guides us, particularly under the rights decision and other decisions in the inverse ratio rule, with a lower threshold for substantial similarity. Doesn't it matter that Rocky and Drago are themselves derived from established stereotypes? I mean, it's one thing if you took something that was entirely fanciful, but Drago is not entirely fanciful. The idea of the product of the Soviet athletic machine, I saw before. So how is that so unique, the idea that they're going to take that expressed in the context of a boxing ring, which may be new to Rocky IV. I haven't thought about it in that term. But it doesn't matter that these characters are pretty stock figures. Your Honor, we need to look no further. An Italian boxer with the first name of Rocky? If I could just go back to Judge Clifton, if I could go back to your point. But let's look no further than their own expert. And what does he say about Drago? Distinct physical traits, distinct personality, a unique aura, a fully dimensioned human being, a distinct nationalistic slant to the movie. But those things aren't the things that are featured in the game. And the nation turns out to be a different nation. Your Honor, we submit that the backstory is what brings those things into the game. Again, if they merely want to take a representation and call to mind and say, hey, those are famous movies about boxing, wouldn't it be a goof to have a couple of characters based on that? There's the line. Judge Kaczynski, you started with the question, did they cross the line? You cross the line when you appropriate so much of what's there that's copyrighted and also a source identifier under the trademark claim, and you appropriate so much that everything that goes into those characters, whether the visual characteristics alone, whether the distinct personality and the aura and the East versus West alone, when you combine all those things together, and we submit they are protectable elements, but the three boys case tells us even if any one of those is unprotectable and you combine them, and then what you have the result is these characters, whatever percentage they make up of the game is a damages issue. These characters, ultimately, everything they are is taken from the movie. And, again... Name isn't? Boris Rakhimov? Doesn't sound anything like... Boris Vodunov. Where's Rocky Squirrel? Rocky G. Squirrel should be here complaining. Granted, they changed the names on the eve of launch, and all through development, of course, the games are Rocky and Drago. There's no mistake what they were about here. They were about taking what is identifiable about those characters, what you can put into a video game. I understand, but you can't sort of... The question is what is it that they present to the public. You say they've added nothing. Well, they've added a name. You know, you say everything there is. Well, I've just shown you one thing that isn't. They did change the name. And they took the movies, condensed the movies into short biographies. They didn't take any of the plot. Well, how can you differ? East, west. Starting with Rocky, they absolutely took the plot. If you look at the biography for Gina Stiletto, it is the arc of the Rocky movies condensed into a short bio. Now, what the Atari, the Midway v. Bondi case, and the Ideal Toy case tell us is we have to make the comparison recognizing that these are in different media. The derivative work right clearly grants the copyright holder to make derivative works in other media. So we have to compare what are those characteristics that are common across. Yes, they are in different media, but you could have, even though they're in different media, you could have plot-driven games. And there are plenty of plot-driven games and role-playing games. So the games are linear. They go from one event to another. You have to complete one mission to get to the next level and so on. So just saying they are different media and therefore there are going to be some differences, yes, you cannot, because of the medium, have, I don't think right now, have real pictures of the real people. You have to have some sort of computer-generated drawing. You can't manipulate that. So that is some difference that is inherent. But you could have a drawing that looks exactly like Donald Trump. We agree on that, don't we? Sure. Or you could approximate him more. You could have made him so that his mother wouldn't, I mean, you know, say, oh, that's my son. Maybe that's a photograph of my son. So that they didn't do. This looks nothing like, you know, you take away the gloves and you take away the context and you show somebody the face of this guy on page 13. I don't think there's a person a hundred. I don't think there's a person a thousand that would say, oh, that's Ivan Drago. But the survey tells us actually, Your Honor, that that's not the case. The Rocky IV movie was released in 1985. You show them the face without the body and without the context? You show them the character as presented in the game. But you don't ever see the face divorced from the body. But you can identify where the particular elements are standing on themselves, are coming. You could make a face that looks just like Donald Trump. You could. And they didn't. So that particular, the way the face is actually shaped and looks and so on, brings very little of Donald Trump into the game. Enough in combination with the biography, the other appearances, and the survey. Again, let's look at the survey. And I understand Judge Clifton's concerns about the percentage levels, but these are percentage levels that are sufficient in a Lanham Act case for showing an actual fusion. This was not a survey. This is something that you guys cobbled together, identified who was running the survey. I mean, come on, this is not a survey. I would disagree. This is the kind of thing ginned up for litigation with a predetermined result. You want a survey, you send people out, do a double-blind test where neither the testers nor the people tested know what the correct answer is. Anything else is just lawyers moving pieces of paper. But it's, I'm disputing the record, there's no competing survey. And interestingly— It's not disputed that it's a pretty rottenly done survey, though. There's evidence to that effect, correct? Well, they brought an expert in to lob criticisms, but there's no survey of their own presented to give any contrary conclusions. And 17 years after the fact— You know, you can say that. We're talking about a slam-bang summary judgment thing, are we not? I don't follow the references. We're not talking about a full trial with all the surveys and all the money. We're talking about a summary judgment and a permanent injunction coming down, boom, right? Judge Fernandez, they moved for summary judgment early. They came in early, long before the close of Discovery, long before experts. I mean, they were hoisted by their own petard at that level, Your Honor. And they still have that pending here. They still have it pending here. They are appealing the denial of their summary judgment. Sure, but the notion that there was something haphazard— A possible range of results here could be affirmance. It could be reversal for trial, and it could also be reversal for judgment for them. Absolutely, but those are— That's the way it happens. But the notion—I think it's a bit unfair to suggest that this was quick and dirty or this was somehow hoisted on them. They moved for summary judgment. We had to go into court to ask for more time. And they may not have been able to prove their summary judgment. I'm not saying one way or the other. The flip side is you may not have been able to prove your summary judgment either on this kind of evidence. I understand. I just think that it's important, though, that the notion that this was cobbled together to somehow pull one over on them. They came to court and said the record, undisputed record as they presented it, supported summary judgment. We had to ask for more time, and we presented a survey. They're well-resourced. They could have presented their own survey. And 17 years after the fact, whatever you may think— Survey is always persuasive. It's persuasive. And I'm telling you, it's not persuasive. It's the kind of thing that I would be surprised— I mean, the surprising thing is that you didn't manage to gin up better numbers, given how poorly the survey was done. So, you know, it really sort of hurts you by its weakness. I think we'll have to agree to disagree as to the quality of the survey. I think the survey was properly performed. And given that, compared to most of these cases, the ideal toy case, the other cases where you have a pop phenomenon that somebody's trying to capitalize on, these are movies—we were 25 years removed from the initial release, and we were 17 years by the time of the survey, from the release of Rocky IV, the most successful. And you still have recognition. Are these actual players? I don't believe— People who actually play the game weren't around when Rocky IV was released. Well, but interestingly, the Internet reviews, the reviews of the game, third-party sources, they recognized it as the characters— And the viewers are sort of— I played the game. They were around. But the people who were actually playing the games, most of them were born in 1984 or thereabouts, or 1988. Well, I think— I have no clue who these people are. Well, and this is why, again, the case really is analyzed through the filter of a party who intentionally is trying to use, whether rightfully or wrongfully, we start from the premise that they're trying to use Rocky and Drago for something. And the intent in selecting those, certainly under the Lanham Act, is evidence that there is some secondary meaning. Their designers, probably no older than the consuming public here, could draw Rocky and Drago from memory. And why would you call it a Drago-like character? Because you've got to come up with 16 characters. Part of what's frustrating here is that you're going to— if you're trying to attach personalities to characters that actually have no personalities, you're going to hit stereotypes. And what I'm still waiting for is, how is this not simply touching the base of a pretty classic stereotype for a boxing movie or for a sports movie? Well, again, there's not a single example in the record offered by Midway of an East versus West boxing movie. There's not another character. Everyone says— But why do we have to limit East versus West to boxing? I mean, if you're trying to identify lots of characters— How many East versus West sports movies? The Olympics. Every Olympics, every four years. And track meets. I remember sitting there vividly watching a track meet. U.S.S.R. track meet, like anybody ever watches track other than during the Olympics. But back in the 1960s, that was big stuff. Personal best. Creating a female version. All the East German women swimmers. There are lots of stories that are East versus West, and this just happened to put it in the boxing record. But I think the problem, Your Honor, I disagree, because if you apply that rationale, then personal best, Miracle that came out, a couple other examples I can think of, are unprotectable because you have pitted East versus West. That element would be unprotectable. Your Honor, if you look at the law, the law says unprotectable is if you have a stock scene that is so commonplace in fiction, not in reality, but in fiction, in film, in book, that you are being constrained from presenting a story because of the copyright granted. They wanted to do a boxing game. There's nothing restraining them from having multitudinous characters. Why do they seize on Drago and Rocky? Because this is not an East versus West game. These happen to be two characters that players can select to play against each other. One of 153 combinations, only in PlayStation. And the other ones they can't play at all. So there's nothing East versus West about the game. It happens to become East versus West when you have to pit these two players. If you pick Drago and your opponent or the computer picks Gino Stellato, then you've got an East-West game going. But there's nothing particularly East-West about the game as a whole or even about that particular contest, is there? Well, when you take the Drago biography, which I'd submit that you do, is it to the same degree? No, there's differences. But when you have the Drago biography, or I'm sorry, the Nakamot biography, which draws so much from Drago, and again, I appreciate Judge Clifton's remarks, but if it was such a trope, when I think of a stock scene, I think of Robert Duvall's character in The Natural, a muckraking newspaper reporter. I can't think of another example of a Drago-like character in a sports movie that isn't just someone that shows up in the last three minutes as the stock antagonist. I mean, their own expert admits that he's developed over the course of the movie. And then they take that development and they condense it down into the biography. They wanted to imbue plot and theme to the game. The one from Russia was Love? Sure. Remember the Russian character played by... That's Robert Shaw. Robert Shaw played him. Robert Shaw. On the train. Well, not just on the train. He was cold, he was muscular. If you could punch him in the stomach, he wouldn't even flinch. Sure. Ivan Drago. Same guy. And the only thing... I mean, he happened not to have boxing gloves at all, but it was an east-west scene. It happened to be England rather than America, but you know, we're the same country, basically, when it comes to fighting the east. Blonde, tall, cold, mechanical, powerful. Doesn't say much. Same guy. I have to commend you, Judge Kaczynski. You've done what Midway's been able to do, which is come up with one example in a completely different motif. That's a question. I recall that he has those things. I thought it was obvious. Yeah, I recall that he has those things. I don't recall the blonde, but I won't dispute the point. Hair was tied blonde. Right. It was unusual. There's no question you have described Robert Shaw's character in the movie. Absolutely. But in a completely different setting, in a completely different context, outside of the sports theme, you know, again, if merely we're trying to protect two men fighting or the fact that you're going for a prize, but you've taken a fairly unique story, a story that even our expert admits is unique and distinctive, largely because of the Drago character, one of the most popular characters from this line of copyrighted works, and they've taken it and appropriated it so that Boris Lankomov, whether he looks exactly like him, is enough of Drago, given the access, given the inverse ratio rule. All right. Thank you. We have Councilor Butler. Thank you, Your Honors. I really just want to touch on this idea of the different media, which I think Judge Kuczynski kind of started on. This whole argument that these works appear in different media is factually and legally wrong. If you look at Section 102A6 of the Copyright Act, that protects motion pictures and other audiovisual works, and courts have held that video games fall under audiovisual works that are lumped together with motion pictures. And there is no reason why they couldn't have imbued their – why we couldn't have imbued our game with all of the elements of Rocky. We could have had a love interest. We could have appropriated all of the different scenes that the Rocky movies fall in. We could have appropriated their music. We could have appropriated video clips. We could have had all of the different boxers that Rocky fights. We could have had a spitting image of Sylvester Stallone, Dolph Lundgren, and all of the other characters. And, in fact, Midway – I'm sorry, MGM licensed just such a game to Rage Games, which does have all of these various elements. So the fact that there are different media involved here is just – it's not true as a matter of fact, because all of these capabilities are there within the video game. We could have designed a game that takes off after the Rocky series with every element that are in the Rocky series. We didn't. We've got two mechanical flat caricature boxers among 17. All they do is run around the rink. They move all the time. They box. That's all they do. And to hold that that's substantially similar to characters and a movie as a matter of law is – in our view, that cannot stand. In our view, we are entitled to summary judgment on this claim and on the trademark claim as well. But at the very least, the declaration of Drew Casper in the record, if nothing else, it shows that there's a question of fact as to liability. So we respectfully request that the court – Is that settlement agreement still on the table as far as Midway is concerned? I'm sorry? Is that settlement agreement still on the table as far as Midway is concerned? Our position is that the case settled. And so if there is jurisdiction for the settlement – I understand you have an argument that the settlement agreement not only is on the table, but it's been signed, sealed, and delivered. But I was asking a different question. Assuming that not to be the case, is it still on the table as far as you're concerned? Yes. Good thing to discuss on your way out with opposing counsel. Thank you. Case just argued. We'll stand for a minute. Thank you. We will next hear argument in –
judges: Kozinski, Fernandez, Clifton